** INBOUND NOTIFICATION : FAX RECEIVED SUCCESSFULLY **
TIME RECEIVED                REMOTE CSID         DURATION   PAGES   STATUS
September 22, 2023 at 5:14:03 PM CDT    6188453536    198     6    Received

Case 3:23-cv-03190-NJR   Document 1   Filed 09/22/23   Page 1 of 6   Page ID #1

09/22/2023   17:11 Pulaski Co Detention Booking      (FAX)6188453536    P.001/006

23-3190-NJR

Kenneth Simpson, et al

v.                                    Case No. _____

Pulaski County Jail, Lt. Ruth windings, Capt. Odkins

### §1983/Bivens Challenge to Conditions of Confinement

Comes now Kenneth Simpson, pro se inmate, on behalf of himself and all others similarly situated, filing this motion pursuant to 42 U.S.C. §1983 or Bivens v Six Unnamed Agents, 403 US 388 (1971) which is the proper avenue for challenges to conditions of confinement, Glaus v Anderson, 408 F.3d 382, 387 (7th, 2005). Though Defendants are local agents of a county jail, they are operating as a federal holding facility, making it uncertain whether Bivens or §1983 is proper.

As a pro se litigant, Simpson is entitled to liberal construing of his motion, Frazier v Varga, 843 F.3d 258, 262 (7th, 2016).

### Background

Simpson was originally arrested in May of 2023 in the Eastern District of Missouri and transferred to Pulaski County for holding.

In late June or early July, prison officials originally announced that they were going to ban and confiscate all books. Inmates would be allowed to pay $.05 a minute to read books on tablets, which had not yet appeared. When inmates complained about the effect on their 1st Amendment rights, especially indigent inmates, the proposed change was quietly dropped

Books were still admitted under previous policy, so long as they came from official distributors like Amazon.

On August 28th, with two weeks notice, physical mail from family and friends (F&F in policy) was no longer allowed, and mail would be scanned for digital viewing. This policy change was to prevent introduction of drugs into the facility. However, it was not applied to commercially sent books, and inmates were told that policy would not change. Books continued to arrive well into September.

On September 14, in response to a request involving books sent to him, Simpson was told that he would not be given them, as policy had been changed. No notice of this change was given, and the up to date inmate handbook still does not mention it. He was informed to use the app if he wished to read, even though not every inmate has a tablet, and all the books are 70 years old or older.

Simpson filed several grievances, which went unanswered for a week, until the books were returned. None of the responses addressed the substance of the grievances. Since grievances are electronic, Simpson has no copy and staff will not print one out. Remedies are still exhausted.

## Argument

Obviously, incarceration comes with significantly reduced liberties, including Constitutional rights. Yet, they do not completely disappear at the prison door, Scruggs v Jordan, 485 F.3d 934, 938 (7th, 2007). Rights can be curtailed to the

extent reasonably necessary to accomodate valid peneological interests.

"This Circuit has long recognized that even denials of specific titles raises serious concerns. See, Munson v Gaetz 673 F.3d 630 (7th, 2012). Even that modest denial requires significant justifications. Here, the issue is much more serious - the complete denial of any and all materials not provided by a service called the Gutenberg Project.

The app in question provides access to titles only in the Public Domain, which are ones where the copyright has expired. This means any available title is over 70 years old. This alone is a significant limitation. While the app brags that it has 70,000 titles, large numbers of them are in a foreign language. Thousands of them are laws, or public speeches. There are hundreds of recipies. And the Bible seems to comprise over 200 entries, as it lists each book individually and has numerous translations of each. The number of titles is misleading at best.

Given the age of most publications, they are of little interest to the average reader. Most, if not all, non-fiction topics are obsolete and useless for educational purposes. Recipes are neither entertaining nor informational. Books are often written in prose or antiquated forms or styles of English which make them difficult reads for even the educated and completely beyond segments of the inmate population.

of use to an inmate - addiction, recidivism reduction, surviving prison, and parenting while incarcerated, among others - are obviously superior to and contain more accurate information to books from 1880 which only counsel prayer. The prison's "alternative" completely prohibits new and current information and entertainment.

    Not only is the prison's "alternative" a vastly inferior one in terms of access to information, it is limited in availability. There are only 16 tablets for a wing of over 30 prisoners. (The ratio in other wings is unknown.) Not every inmate has one or can access one. The app also has no search function for an inmate to find titles or a way for an inmate reading a title to save his place.

    The reduction in information is significant, and, for some inmates, complete. The loss of 1st Amendment rights is beyond anything ever approved before. The loss of titles related to law and self-improvement also directly hinders inmates' abilities to present a defense, obtain a more favorable sentence, or rehabilitate themselves.

    From an institution perspective, inmates who wish to better themselves are working to the benefit of society. Numerous studies and Congressional findings in the Second Chance Act and First Step Act find that education improves prison conditions and reduces recidivism. Even passive reading for entertainment reduces prison discipline issues. An inmate who is reading is not engaging in anti-social behavior. Penological interests are best served by keeping books, not this.

    The county jail claims this is needed to keep drugs

out. There is no evidence that drugs are coming in, however, via Amazon. To the contrary, the previous policy required books to come through services like Amazon because this prevented drugs from coming in. This policy is used by county jails and prisons across the country and is quite effective.

Courts have routinely addressed such concerns from prisons and found them insufficient to support banning books. Third party publisher options of the sort used here previously have often been found to be a satisfactory balance of institution and individual interests, Jackson v Elrod, 881 F.3d 441, 446 (7th, 1989)(citing Bell v Wolfish, 441 US at 590; and collecting cases). The prison here has, without warning, engaged in a policy courts have repeatedly rejected, and the lack of notice has cost dozens of inmates and their families money as they already purchased books before the change.

In the case that the jail argues that it will, in the future, offer a pay service, that, too, is not a sufficient alternative. Under a physical book system, inmates with money subsidize inmates without, either by contributing their titles to the prison collection or by loaning out their books. This allows indigent inmates to read current titles. The 1st Amendment exercise of one inmate vindicates others.

A pay per view system eliminates a common collection and limits the amount an inmate can read based on how fast he can read. Instead of paying $8 a title to read the title at leisure, it now costs $3 an hour to read once. A slow reader may incur $30 in costs to read one title.

Given this, the balance of competing interests is against current policy, and it cannot stand.

## Conclusion

Simpson, and all other affected inmates, thus ask this Honorable Court to strike this policy and to bear the costs of this litigation. Simpson further asks for all other attendant costs including, but not limited to, costs for the boots, shipping, phone calls to resolve the issues, and chirps.

Respectfully submitted,
this ___ day, September,

Kenneth Simpson